UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JOSEPH McALEAR, individually and on behalf of all others similarly situated,<br><br>Plaintiff<br><br>v.<br><br>nCINO, INC. and LIVE OAK BANCSHARES, INC.,<br><br>Defendants. | Case No. 7:21-cv-47-M<br><br>**AMENDED COMPLAINT**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

Joseph McAlear, individually and on behalf of a class of similarly situated individuals, hereby states and alleges the following against Defendants nCino, Inc. ("nCino") and Live Oak Bancshares, Inc. ("Live Oak Bank") (collectively, "Defendants").

## I. SUMMARY OF THE ACTION

1. This class action challenges an illegal agreement between nCino, Live Oak Bank, and non-party Apiture LLC ("Apiture") to suppress competition for each other's employees (the "No-Hire Agreement"). The No-Hire Agreement pertained to all employees of nCino and Apiture, and employees in the software engineering department of Live Oak Bank, employed in Wilmington, North Carolina. The express purpose of the No-Hire Agreement was to prevent the companies from having to pay competitive wages to attract and retain talent.

- 1 -

2. The No-Hire Agreement began as early as nCino's founding in 2011, and has continued to the present. The No-Hire Agreement restrains competition in the labor market and is *per se* unlawful under federal and North Carolina law. Plaintiff seeks damages for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and North Carolina General Statutes §§ 75-1 and 75-2.

## II. JURISDICTION AND VENUE

3. Plaintiff brings this action to recover treble damages, costs of suit, and reasonable attorneys' fees, arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and North Carolina General Statutes §§ 75-1 and 75-2.

4. The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331, 1337, and 1367.

5. Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district, a substantial portion of the affected interstate trade and commerce was carried out in this district, and Defendants reside in this District.

## III. THE PARTIES

### A. Plaintiff

6. Plaintiff Joseph McAlear is a citizen and resident of the State of North Carolina. Mr. McAlear is a former employee of Live Oak Bank and Apiture. He was injured in his business and property by reason of the violation alleged herein.

### B. **Defendants**

7. Defendant nCino is a publicly-owned financial technology company offering digital banking platforms to customers. It is headquartered and has its principal place of business in Wilmington, North Carolina.

8. Defendant Live Oak Bank is a publicly-owned bank with a financial technology division. It is headquartered and has its principal place of business in Wilmington, North Carolina.

### C. **Unnamed Co-Conspirators**

9. Apiture is a private financial technology company offering digital banking technology. It is a joint venture between Live Oak Bank and First Data Corporation. Apiture's principal place of business is Wilmington, North Carolina.

## IV. CLASS ACTION ALLEGATIONS

10. Plaintiff brings this action on behalf of himself and all others similarly situated (the "Proposed Class") pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Proposed Class is defined as follows:

> All natural persons employed by nCino or Apiture in Wilmington, North Carolina, and/or employed by Live Oak Bank's financial technology division in Wilmington, North Carolina, at any time from January 27, 2017 through the present. Excluded from the Proposed Class are: members of the boards of directors; C-suite or executive-level managers; and any and all judges and justices and chambers' staff assigned to adjudicate any aspect of this litigation.

11. Plaintiff does not, as yet, know the exact size of the Proposed Class because such information is in the exclusive control of Defendants. Based upon information and

- 3 -

belief, there are at least seven hundred Class members. Joinder of all members of the Class, therefore, is not practicable.

12. The questions of law or fact common to the Class include but are not limited to:

    a. whether Live Oak Bank and nCino had a No-Hire Agreement between approximately 2011 and the present, which agreement expanded to include Apiture as of approximately 2017;

    b. whether Live Oak Bank, nCino, and Apiture concealed the existence of the No-Hire Agreement from members of the Proposed Class;

    c. whether Defendants' conduct violated the Sherman Act;

    d. whether the No-Hire Agreement is a *per se* violation of the Sherman Act, or alternatively whether the No-Hire Agreement violates the rule of reason or "quick look" standards;

    e. whether Defendants violated N.C. Gen. Stat. §§ 75-1 and 75-2;

    f. whether the No-Hire Agreement is a *per se* violation of N.C. Gen. Stat. §§ 75-1 and 75-2, , or alternatively whether the No-Hire Agreement violates the rule of reason or "quick look" standards;

    g. whether the No-Hire Agreement restrained trade, commerce, or competition for employees between nCino and Live Oak Bank, and/or between nCino and Apiture;

    h. whether Plaintiff and the Proposed Class have suffered antitrust injury; and

    i.  the difference between the total compensation Plaintiff and the Proposed Class received from nCino, Live Oak Bank, and Apiture, and the total compensation Plaintiff and the Proposed Class would have received from nCino, Live Oak Bank, and Apiture in the absence of the No-Hire Agreement.

  13.  These and other questions of law and fact are common to the Proposed Class, and predominate over any questions affecting only individual members of the Proposed Class.

  14.  Plaintiff's claims are typical of the claims of the Proposed Class.

  15.  Plaintiff will fairly and adequately represent the interests of the Proposed Class and has no conflict with the interests of the Proposed Class.

  16.  Plaintiff has retained counsel experienced in antitrust and class action litigation to represent himself and the Proposed Class.

  17.  This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action. By contrast, prosecution of separate actions by individual members of the Proposed Class would create the risk of inconsistent or varying adjudications, and be inefficient and burdensome to the parties and the Court.

## V. FACTUAL ALLEGATIONS

### A. Trade and Commerce

  18.  Defendants and Apiture employed members of the Proposed Class in North Carolina, including in this judicial district.

19. Conduct by Defendants and Apiture has substantially affected interstate commerce throughout North Carolina and the United States, and has caused antitrust injury throughout North Carolina and the United States.

B. **Competition for Financial Technology Employees in Wilmington**

20. Live Oak Bank, nCino, and Apiture are the leading employers for financial technology employees in Wilmington, North Carolina. All three are involved in the development of digital banking technology. There are no other peer financial technology companies in Wilmington.

21. In a properly functioning and lawfully competitive labor market, nCino, Live Oak Bank, and Apiture would compete for employees by recruiting and hiring from each other. The consequence of their geographic proximity on competition for employees is profound. To work for any other potential employer in the same industry would require an employee to move to another city – at minimum, to the Research Triangle, approximately 130 miles away. That involves significant costs to the employee, which may include moving a family, finding new schools for children, finding new places of worship, and finding alternative employment for a spouse. None of these costs would occur if an employee switched between Live Oak Bank, Apiture, or nCino. As a result, but for the No-Hire Agreement, Live Oak Bank, Apiture, and nCino would have been each other's key competitor for employees, and their competition would have driven up employee pay.

22. Competition for employees via recruiting and lateral hiring has a significant impact on compensation in a variety of ways. First, when employers become aware of

- 6 -

attractive outside opportunities for their employees, the threat of losing them to competitors encourages employers to preemptively increase compensation to increase morale and competitive positioning, and ultimately to retain their talent. If employers do not react to competition, their employees are likely to seek positions that offer more generous compensation and benefits elsewhere, or be receptive to recruiting by a rival employer. Once an employee has received an offer from a rival, retaining the employee may require a disruptive increase in compensation for that individual, if retention is possible at all. Employers therefore have an incentive to preemptively pay their employees well enough that they are unlikely to seek or pursue outside opportunities. Preemptive retention measures thus lead to increased compensation for all employees.

23. Second, the availability of desirable positions at competing employers forces employers to reactively increase compensation to retain employees who are likely to join a competitor institution. This can occur both when a particular individual or group of individuals becomes interested in switching employers and the current employer responds by offering a compensation increase to retain them, or when an employer responds to overall attrition rates by increasing compensation levels. In the former case, even a targeted increase designed to retain a certain group of employees will put upward pressure on the entire compensation structure. This is due to a foundational principle in compensation design called "internal equity," which refers to the concept that employees want to be paid equitably with their peers. Targeted retention raises comes at a cost to the employer: after making those targeted raises, the well-known forces of internal equity will impact the broader pay structures, raising other employee pay as well. The

misconduct alleged here prevented this competitive process from occurring, suppressing Class pay.

24. The positive compensation effects of hiring employees from competitors are not limited to the particular individuals who seek new employment, or to the particular individuals who would have been offered new positions but for the No-Hire Agreement. Instead, the effects of recruiting and hiring from competitors (and the effects of suppressing recruiting and hiring, pursuant to agreement) commonly impact all employees of the participating institutions.

25. If operating under competitive and lawful conditions, Live Oak Bank and nCino, and Apiture and nCino, would have recruited and hired employees from each other, driving employee pay up. The companies knew this and avoided such competitive wage pressure by entering into the No-Hire Agreement.

### C. Live Oak Bank, nCino, And Apiture Agree Not To Compete For Employees.

26. Live Oak Bank focuses on small business loans and deposits. It also maintains an active financial technology division.

27. In 2011 Live Oak Bank executives co-founded nCino to specialize in the development of online banking technology. Specifically, Live Oak Bank CEO James "Chip" Mahan and Live Oak Bank President Neil Underwood were co-founders of nCino and were members of its Board of Directors from 2011 until at least late 2017. They also participated in the search for and hiring of nCino CEO Pierre Naudeé. Upon information

- 8 -

and belief, the executives of Live Oak Bank and nCino, including Mahan, Underwood, and Naudeé, entered into the No-Hire Agreement from the outset of nCino's founding.

28. After nCino's founding, Live Oak Bank continued to develop and invest in its own financial technology department. In 2017, Live Oak Bank and First Data Corporation (based in Austin, Texas) created Apiture as a joint venture, owned fifty percent by each company. Live Oak Bank's financial technology department was largely transferred to Apiture and the employees working therein became Apiture employees. Chip Mahan and Neil Underwood serve on Apiture's board of directors and have substantial day-to-day control over the company, including through their frequent direct communications with Apiture COO Christopher Cox. Mahan, Underwood, Cox, and others ensured that the No-Hire Agreement that Live Oak Bank had with nCino extended to include Apiture as well.

29. As Apiture and nCino evolved to compete more and more with each other in the digital banking market, tensions between the companies grew. In approximately late 2017 or 2018, nCino leadership removed Mahan and Underwood from its board of directors. However, despite fierce competition in the product market, the companies maintained their agreement not to compete in the labor market. The No-Hire Agreement continued unabated, as it continued to benefit the companies by eliminating competitive wage pressure.

### D. nCino Rejected Plaintiff McAlear's Application Because Of The No-Hire Agreement

30. Plaintiff McAlear joined Live Oak Bank's financial technology department as a Project Manager in April 2017. He was hired by and reported to Pete Underwood, brother of Neil Underwood. Mr. McAlear had been living in Wilmington for ten years, but he had been employed that entire time as a consultant to the federal government in Washington, D.C., working remotely from Wilmington.

31. When Mr. McAlear joined Live Oak Bank, his experiences made it clear that the No-Hire Agreement between Live Oak Bank and nCino had been firmly in place for years. Specifically, several of his new colleagues expressed surprise that he was a Wilmington local. These colleagues explained that the company only hired from outside Wilmington, so it was remarkable for a new hire to be from the area. Mr. McAlear did not think too much about these comments until he needed to hire a new employee to report to him. Mr. McAlear conducted the interviews of prospective hires himself, but he needed to get Pete Underwood's approval before he could even interview a candidate. Mr. McAlear noticed that Pete Underwood rejected every qualified local candidate that Mr. McAlear proposed to interview. Pete Underwood claimed that he knew every single proposed local person and that they were not good candidates, a claim which Mr. McAlear found implausible. His colleague, Geoff Gohs, explained to Mr. McAlear that Pete Underwood rejected all the local candidates because "we bring in everyone from outside."

32. In October 2017, when Live Oak Bank's joint venture with First Data launched, Mr. McAlear became a Vice President at Apiture. Mr. McAlear is a specialist in agile software development, an approach that he advocated for at Apiture with mixed success. He was able to pursue an agile approach, but his managers were not themselves educated or invested in it. In April 2019 he attended the TriAgile conference in Raleigh, North Carolina. He met several representatives from nCino there, including recruiter Ren Yonker, all of whom were also very enthusiastic about agile software development. Mr. McAlear was thrilled to learn that there was another company in Wilmington that was invested in his area of expertise. Mr. McAlear went to the nCino website and found a job opening that matched his qualifications and submitted an application. A day or two later, he received the following email from recruiter Ren Yonker:

> I hope you had an enjoyable time at TriAgile on Tuesday, it was a pleasure meeting you. I talked to my Director of Recruiting and there is a "gentleman's agreement" between our companies that we won't recruit one another's employees. With that being said, we will not be able to proceed with your candidacy on the Manager, Scrum Master role. I would very much enjoy to keep in touch and would be more than happy to help with coordinating an Agile Meetup group in the area.

33. Mr. McAlear was disappointed, but continued working for Apiture. Shortly thereafter, Mr. McAlear participated in a discussion with several Apiture managers where the No-Hire Agreement again came up. Apiture manager Matt Cook had an acquaintance at nCino who wanted to apply for a quality assurance job on the Apiture quality assurance team led by Dwayne Hill. Mr. Cook and Mr. Hill were discussing the nCino candidate right next to Mr. McAlear's desk, when Chris Cox (then Apiture President and

- 11 -

2301100.1
Case 7:21-cv-00047-M    Document 35    Filed 09/29/21    Page 11 of 19

currently COO) came out from his office and joined the conversation. Mr. Cox informed them that he had spoken with his counterpart at nCino about hiring, and that if any employee of either company wanted to pursue a position with the other company, he or she had to inform their current manager first, and the companies collectively would decide whether the application could proceed. Mr. McAlear expressed his strong opposition to this policy, finding it to be collusive and unethical. Mr. Cox responded that this was the agreement between the companies, and made it clear it was not up for discussion.

34. Not long thereafter, Mr. Cox informed Mr. McAlear that Apiture had decided to eliminate his position. Mr. McAlear again applied to nCino but was rejected. To find employment within his skill set, Mr. McAlear had to move to the Research Triangle, which caused significant expense and disruption in his personal life.

### E. Defendant's Conspiracy Suppressed The Mobility And Wages Of Plaintiff And The Proposed Class

35. As Plaintiff's experience illustrates, Defendants reduced competition among themselves for employees by entering into the No-Hire Agreement alleged herein. Defendants and their co-conspirator entered into, implemented, and policed the No-Hire agreement with the intent and effect of suppressing the compensation of their employees at artificially low levels.

36. First, the No-Hire agreement eliminated competitive pressure for Defendants and their co-conspirator to preemptively raise the compensation of Plaintiff and members of the Proposed Class, because there was no threat of poaching by the

- 12 -

2301100.1
Case 7:21-cv-00047-M   Document 35   Filed 09/29/21   Page 12 of 19

competing institutions. The No-Hire Agreement thus artificially depressed compensation for Plaintiff and all members of the Proposed Class.

37. Second, because the agreement eliminated the primary competitors for lateral hires, Defendants and their co-conspirator were relieved from having to react to outside offers by offering higher pay, which would have increased the compensation of not just the person receiving the offer but all or nearly all Proposed Class Members, as the effects spread across the pay structure.

38. Third, because Defendants and their co-conspirator constitute the only established financial technology employers in Wilmington, the agreement drastically increased the costs for Plaintiff and others to seek or accept employment elsewhere. To change positions, Plaintiff and others similarly-situated would have to incur significant relocation costs to work at a peer company. Defendants and their co-conspirator were thus able to retain Plaintiff and members of the Proposed Class at artificially low compensation levels by increasing costs associated with changing employers.

39. Plaintiff and members of the Proposed Class were harmed by the No-Hire agreement alleged herein. The reduction of competition and suppression of compensation and mobility had a cumulative effect on all members of the Proposed Class.

40. Without this class action, Plaintiff and the Proposed Class have been and will be unable to obtain compensation for the harm they suffered, and Defendants and their co-conspirator will retain the benefits of their unlawful conspiracy.

## FIRST CLAIM FOR RELIEF
### (*Violation of the Sherman Act, § 1*)

41. Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further alleges as follows.

42. Live Oak Bank and nCino entered into and engaged in unlawful agreements in restraint of the trade and commerce described above in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Beginning no later than 2011 and continuing through the present, Live Oak Bank and nCino engaged in continuing trusts in restraint of trade and commerce in violation of Section 1 of the Sherman Act. Beginning no later than October 2017, Live Oak Bank and nCino extended this agreement to include Live Oak Bank's new joint venture, Apiture.

43. Live Oak Bank and nCino's agreements have included concerted action and undertakings among them with the purpose and effect of: (a) fixing the compensation of Plaintiff and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition between them for employees.

44. As a direct and proximate result of Live Oak Bank and nCino's No-Hire Agreement, members of the Proposed Class have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits.

45. The unlawful No-Hire Agreement had the following effects, among others:

    a.    competition between Live Oak Bank (including Apiture) and nCino for employees was suppressed, restrained, or eliminated; and

b. Plaintiff and members of the Proposed Class have received lower compensation from Live Oak Bank, Apiture, and nCino than they otherwise would have received in the absence of the No-Hire Agreement, and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

46. The acts done by Live Oak Bank, Apiture, and nCino as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered, or done by their respective administrators while actively engaged in the management of their affairs.

47. The No-Hire Agreement is a *per se* violation of Section 1 of the Sherman Act.

48. Accordingly, Plaintiff and members of the Proposed Class seek three times their damages caused by Live Oak Bank, Apiture, and nCino's violations of Section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and a declaration that such agreement is unlawful.

## SECOND CLAIM FOR RELIEF

### *(Violation of N.C. Gen. Stat. §§ 75-1 & 75-2)*

49. Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further alleges as follows.

50. Live Oak Bank and nCino entered into and engaged in unlawful agreements in restraint of the trade and commerce described above in violation of N.C. Gen. Stat. §§ 75-1 and 75-2.

51. Live Oak Bank and nCino's agreements have included concerted action and undertakings among them with the purpose and effect of: (a) fixing the compensation of Plaintiff and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition between them for employees.

52. As a direct and proximate result of Live Oak Bank and nCino's No-Hire Agreement, members of the Proposed Class have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits.

53. The unlawful No-Hire Agreement had the following effects, among others:

   a. competition between Live Oak Bank (including Apiture) and nCino for employees was suppressed, restrained, or eliminated; and

   b. Plaintiff and members of the Proposed Class have received lower compensation from Live Oak Bank, Apiture, and nCino than they otherwise would have received in the absence of the No-Hire Agreement, and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

54. The acts done by Live Oak Bank, Apiture, and nCino as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered, or done by their respective administrators while actively engaged in the management of their affairs.

55. The No-Hire Agreement is a *per se* violation of N.C. Gen. Stat. §§ 75-1 and 75-2.

56. Accordingly, Plaintiff and members of the Proposed Class seek three times their damages caused by Live Oak Bank, Apiture, and nCino's violations of N.C. Gen.

Stat. §§ 75-1 and 75-2, the costs of bringing suit, reasonable attorneys' fees, and a declaration that such agreement is unlawful.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment on his behalf and that of the Proposed Class by adjudging and decreeing that:

A. This action may be maintained as a class action, with Plaintiff as the designated Class representative and their counsel as Class counsel;

B. Live Oak Bank, Apiture, and nCino engaged in a trust, contract, combination, or conspiracy in violation of Section 1 of the Sherman Act and N.C. Gen. Stat. §§ 75-1 and 75-2, and that Plaintiff and the members of the Proposed Class have been damaged and injured in their business and property as a result of this violation;

C. The alleged combinations and conspiracy be adjudged and decreed to be *per se* violations of the Sherman Act and N.C. Gen. Stat. §§ 75-1 and 75-2;

D. Plaintiff and the members of the Proposed Class he represents recover threefold the damages determined to have been sustained by them as a result of the conduct of Live Oak Bank, Apiture, and nCino complained of herein, and that judgment be entered against Live Oak Bank and nCino for the amount so determined;

E. Judgment be entered against Live Oak Bank and nCino in favor of Plaintiff and each member of the Proposed Class he represents, for restitution and disgorgement of ill-gotten gains as allowed by law and equity as determined to have been sustained by them, together with the costs of suit, including reasonable attorneys' fees;

F. For prejudgment and post-judgment interest;

2301100.1

H. For equitable relief, including a judicial determination of the rights and responsibilities of the parties;

I. For attorneys' fees;

J. For costs of suit; and

K. For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial for all claims and issues so triable.

Dated: September 29, 2021   Respectfully submitted,

*(signature)*

Dean M. Harvey
Anne B. Shaver
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
dharvey@lchb.com
ashaver@lchb.com
Local Civil Rule 83.1(e) special appearance counsel

*/s/Daniel Lyon*
Robert M. Elliot
N.C. State Bar No. 7709
Daniel Lyon
N.C. State Bar No. 43828
ELLIOT MORGAN PARSONAGE, PLLC
426 Old Salem Rd.
Brickenstein-Leinbach House
Winston-Salem, NC 27101
Telephone: (336) 724-2828
Facsimile: (336) 724-3335
rmelliot@emplawfirm.com
Local Civil Rule 83.1(d) Counsel for Plaintiff

*Counsel for Individual and Representative Plaintiff Joseph McAlear*